## COAL RUN COAL CO.

### v.

### MARY JONES.

1. MINING.—The court is of opinion that the fourth section of the statute entitled "Health and Safety of Miners" (Sessions Laws 1883, p. 114) is applicable to this case; that the place where the accident occurred was a mine within the meaning of the statute, and the fact that the miners were not actually mining coal at the time, does not affect the question.

2. SAME.—Where the cause of action was in part based on the statute and in part on the failure of appellant to use due care by proper appliances to keep the shaft clear of fire damp, it was not error to refuse instructions as to the doctrine of fellow-servants.

3. EVIDENCE—MARRIAGE.—In an action on the case by a wife for damages for the death of her husband the party sued offered the evidence of another woman to prove that the latter was the wife of deceased and not the former. Held, that it was proper to exclude such evidence.

APPEAL from the Circuit Court of La Salle county; the Hon. GEO. W. STIPP, Judge, presiding. Opinion filed February 20, 1886.

This was an action on the case to recover damages on account of the killing of Thomas D. Jones, the husband of appellant, by reason of the wrongful act of the appellant, as is claimed in the first count, he carelessly and negligently permitting explosive gas to fill the coal shaft, in which deceased was engaged as the employe of the appellant in repairing it, fifty-three feet below the surface of the ground on a platform, to a distance above said platform so that the explosive gas was ignited by the lamp of deceased while in the exercise of care, and exploding, killed him by throwing him against the sides of the shaft, whereby appellee has been deprived of her means of support, and in second

count, same as first, and also charges that appellant did not cause the mine to be examined by a competent person with a safety lamp and did not provide means of signaling between the top and bottom of said mine. Verdict for appellee $3,500, upon which judgment was rendered. The facts are in substance as follows, to wit:

The appellant had just completed his coal shaft, or rather the extension of one from a second vein of coal which it had been operating. The shaft altogether was from 150 to 200 feet deep. The lower vein of coal had been reached and dug through and a pit dug several feet below it for the purpose of catching the drainage of the mine called a "sump." The shaft, which, in all, is about eight by sixteen feet in size, had been timbered up from the bottom to within five or six feet of the floor of the first vein of coal some fifty-seven feet below the surface of the earth. This shaft is divided into three compartments, each of which is boarded up water-tight, and about five and a half to six feet one way and about eight the other, and when entirely finished from the bottom to the top, the east one is used for carrying the air from the bottom of the mine to the surface, the other two for carrying the air down for ventilating purposes to the bottom of the mine, and for hoisting coal and working the mine. The current of air is created by a furnace and a chimney stack at some distance from the top of the mine connected by an air-tight flue under ground to the east compartment, and causes, by the heat in the furnace rarifying the air in the stack, a current of air to be set in motion from the bottom of the shaft passing up through the furnace and a corresponding down current to the bottom of the mine through the other two compartments. This removes noxious gases and supplies the mine with pure air. The one compartment that carries the air up is called the "up cast" and the other the "down cast." In this instance when the accident occurred there was no fire in the furnace, nor was any needed, because the air was supplied at the mouth of the old mine where deceased was at work at the first vein by a slope entrance running from the mine entrance at the perpendicular shaft and opening at the surface of the earth some

800 or 1,000 feet from the mouth of the last-named shaft. Over the shaft compartment completed from the bottom of the third vein of coal which had not yet been worked, on the morning of the 19th November, 1883, just at the floor of the mine in the first vein of coal a platform was placed, almost; but not quite, air-tight, covering all the three apartments in the shaft, in preparation for mining coal out of the first vein, which they were engaged in that morning, to keep coal, and the workmen there engaged, from falling down the shaft below, and to make standing room for the men who were engaged with the deceased in making a double wall of wood at the four sides of the shaft at the mouth of the mine, between which clay walls were being tamped in order to close the old mine so that water, which, when high, was accustomed to flow in from the Vermillion river through the said slope entrance, could not get into the new mine. There was a cage being worked by machinery from this first vein entrance to bring down material to make this wall and to take up coal from this platform. The deceased was more particularly engaged under the supervision of one Hillger, who was superintending the work of completing the shaft, and had been from the time it was commenced at the bottom at the third vein, together with four or five other men, some in helping him and some in mining and raising coal to make way for the wall. While so engaged, his light becoming dim on account of the wick in his lamp becoming too low, he attempted to raise it in the lamp as was customary, by striking or jarring his lamp on the toe of his shoe while in a position several inches above the platform, his heel resting on the floor, and in doing so the gas ignited and the fire running down into the accumulated gas below the platform, it exploded with great violence and threw him against the walls of the shaft or the roof of the old mine with such force as to instantly kill him. John Shanks, Manahan, deceased, Jones, David James, Irvin Tiffany, and Hillger, the boss, were at work on this shaft at the time of the explosion. In sinking the shaft from the second vein to the third vein Shanks and Manahan, who did the work of sinking this shaft by contract, testify that they found gas or "fire

damp," as it is called, all the way down from the second vein, but most of the gas was making in the fourteen feet of slate and soapstone above the coal.

It was not making extra quantities; a little would come from it when they would go through it. The vein of slate, about twenty inches thick, laid about fourteen feet above the coal. In going down from the second vein the gas would generate all the way through the drill hobs. John Hillger superintended the timbering up the shaft, the sinking of which was completed some eight days before the explosion. The platform covering all the compartments, though air-tight, there being spaces in it from one fourth inch to an inch wide, was put down about seven to eight o'clock in the morning, and they worked about three and a half hours before the accident. There was a good current of air above the platform coming through the old worked-out mine from the slope entrance which ascended to the top of the shaft. There was none below, the current having been cut off by the removal of a section of the "up cast" and "down cast," and by reason of the allowing of the water at the bottom of the shaft to accumulate and rise above the foot of the timbering and sections of the "up casts" and "down casts," thereby preventing any circulation. If the water had not been allowed to accumulate and to rise, as stated by witnesses for appellee, there would, in their opinion, have been sufficient circulation of air to have carried all the gas out, provided the platform had not interrupted it. The day the accident occurred was the third day deceased had been at work. He had nothing to do with putting in the platform. Whether the question of gas was discussed during the three days which Jones, deceased, was there, witness Shanks could not testify "for sure." If the platform and water had not been there, there would have been a circulation at the bottom. Colon Manahan testifies that in case there had been no water at the bottom, that if part of the platform over the air-chamber had been removed and the air left to travel up the air-chamber, there could have been a circulation of air. "I think there would have been sufficient draft to remove the gas that was making if the water had been out." "If the water

Coal Run Coal Co. v. Jones.

had been removed, as I have said, I don't think there would have been the accident." "Gas will rise, because it is lighter than air." Witnesses for appellant state that if no water had been in the mine it would make no difference, as there could have been no circulation of air any way, whether there had been an opening there or not. (Testimony of Alex. Ronald, inspector of mines.) This witness thinks the platform might have been made tight enough to prevent the gas from accumulating above it, and been safe. There was no "down cast." The slope was the "down cast." Hillger testifies for defendant that he knew there was a little gas making, but didn't expect there was any more than was escaping through the platform. The platform was just on a level with the bottom of the first vein of coal. He told Jones, deceased, just what was making in the shaft. Thinks all the gas came from the coal —more out of the coal than the slate. They often lighted the gas when digging the "sump," and worked all day by it. After the accident Hillger inspected the mine every morning with a safety lamp before sending the men in.

The appellant introduced the evidence of M. J. Evans and others, tending to show that she was the wife of deceased; that she was married again, but never had a divorce from deceased, and had two children by Jones, deceased, one a boy, seventeen, and a girl thirteen years old. Evans and she had separated. She claimed to be the wife of deceased by marriage prior to appellee's. The court excluded all this evidence from the jury, to which exception was taken. The object was to show that Mrs. Evans, and not appellee, was the widow of Jones, deceased.

Mr. WALTER REEVES and Mr. E. F. BULL, for appellant; that the evidence that appellee was not deceased's wife, should have been admitted, cited Quincy Coal Co. v. Hood, 77 Ill. 68.

Messrs. FOWLER BROS. and Mr. J. B. RICE, for appellee; that the above evidence was inadmissible, cited T. W. & W.

Coal Run Coal Co. v. Jones.

Ry. Co. v. Brooks, 81 Ill. 248; R. R. I. & St. L. R. R. Co. v. Delaney, 82 Ill. 199; Conant v. Griffin, 48 Ill. 410.

LACEY, P. J.   The appellant, by counsel, urges various causes for error.

1st.   That Sec. 4, Chap. 93, of the law of 1883, in regard to the examination of the working place of miners, does not apply to a case like this, but that appellant was sinking a shaft preparatory to opening a coal mine and that the men were not mining.

2d.   The court refused to give the appellant's 6th and 14th refused instructions, which raised the question of whether the deceased did not come to his death by the negligence of fellow servants, where reasonable care had been exercised by appellant in selecting them.

3d.   The verdict was against the weight of the evidence, and especially on the point that the deceased was not in the exercise of ordinary care at the time of the accident in this, that he was negligent in tapping his lamp on the toe of his shoe in the manner he did.

4th.   The court excluded the evidence of Mary J. Evans.

In the first place we shall consider the first point of objection in regard to the applicability of the statute.   The 4th section of the statute entitled "Health and Safety of Miners," in force July 1, 1883, Sessions Laws 1883, page 114, as far as applicable to this case provides as follows:   "The owner, agent or operator of every coal mine, whether operated by shaft, slope or drift, shall   *   *   *   in all mines where fire damp is generated, every working place where such fire damp is known to exist, shall be examined every morning with a safety lamp, before any other persons are allowed to enter."   In the first place, it is insisted that this is not a mine within the meaning of the statute.   That the statute only contemplates a case where the miners are engaged in mining coal, and that the working spoken of in the statute means the place at the point of digging the coal.   With this construction we can not agree. We think the word "mine" includes a work like this, and although the workmen were not actually mining at the time,

they still had a working place and were working in a mine, and exposed to be injured by the explosion of fire damp. The lower vein was ready to work except for the stopping up of the entrance to the first vein, and the gas was generated from the coal in the mine. There was just as much necessity for the protection of the workmen who were working in this mine as though they had been actually mining coal, and the statute does not provide that the workmen in the mine shall be mining coal. Evidently any workman in a mine, at whatever employment he may be engaged, is included in the language of the statute. Besides this the evidence shows that these workmen we e actually engaged in mining coal from the first vein when the accident occurred, and the fact that such mining operation was to be carried on required more of the shaft to be covered than otherwise would have been required. The deceased himself was about to pick up and place in the cage a lump of coal at the time the explosion took place. Judging from the evil intended to be cured by this act and the dangers to be guarded against we can not doubt but it was the intent of the legislature to cover a case like this. To hold otherwise we think would be to place too narrow a construction on the act. We see no error then in the court below holding as it did on this point.

But the instruction of the court below on this point is objected to on another ground, as we understand the objection, and that is, there was no evidence on which to base it. It is said in argument that "Appellee in his brief argues that it was the duty of appellant to cause said shaft to be examined by a suitable person with a safety lamp in the morning before the men went to work in the shaft. * * On that question we remark, that the theory of both sides in this case is that until a platform was erected across said shaft there could be no accumulation of gas in said shaft, and as said platform was erected the morning of the day the accident occurred by the men themselves, who were then ready to go to work, that such examination would have been a fruitless search for gas and a task wholly unnecessary, * * and could have resulted in no additional safety * * to the employes." If this

were so and perfectly clear, the court erred in calling the attention of the jury to the statute, for unless some injury could have resulted on account of this neglect, the instruction would only have tended to mislead the jury. We have examined this evidence with care to see if this statement is correct, and we are unable to say that it is. The most that we can say is that it leaves the matter doubtful in our minds as to whether a search for gas in the morning before the platform was erected would have disclosed any dangerous quantities, such as would have created a sense of danger in the mind of the overseer and induced him to adopt preventive remedies, or to have shown him it would be dangerous to set men to work as they were.

It was the object of the statute to surely expose and make known by such an examination all danger from fire damp. Where the evidence tends to show that an examination might have prevented the injury, the instruction would be proper to be given.

According to some of the evidence all circulation of air from the bottom of the mine to the first vein was cut off by means of the accumulation of the water in the bottom of the mine before this platform was put in, and in view of the intention of putting in the platform, it would be important to know how much was accumulated in the shaft below that point to know how soon the danger point would be reached after the platform was put in place. And the fact of there being an accumulation of gas below the first vein before the platform was erected is strengthened by Hillger's testimony that the gas escaped very slowly—was almost stopped by the water; otherwise there could not have sufficient quantity accumulated to cause an explosion in three and one half hours after the platform was erected. The evidence, we think, was sufficient to justify the instruction. In finishing the work afterward, Hillger complied with the statute in regard to the examination with a safety lamp before the men went to work. As to the refusal of the court to give the sixth and fourteenth instructions, on the question of fellow servants, we see no error. This was a cause of action in part based on the statute

Coal Run Coal Co. v. Jones.

and in part on the failure of the appellant to use due care by proper appliances to keep the shaft clear of fire damp, and the doctrine invoked by the instructions would not have been applicable and the giving of them mischievous. The question of whether the appellee's decedent was in the exercise of ordinary care to prevent injury was a question of fact that under all the circumstances we would not say that the jury were not justified in finding as they did. That the court excluded the evidence of Mary E. Evans is the last assigned error. The precise point seems to have been held against the claim of appellant in Conant v. Griffin, 48 Ill. 410. The court below refused the defense the permission to show that Ann Barber was not the widow and Frank Barber not the legitimate son, the same as, in the present case, the court refused appellant the claim he made to have the right to show that Mary Jones was not the widow of deceased and her children not legitimate. The court said that "the averment that Ann Barber was the widow and Frank the son was surplusage, the requirement of the statute being met by the allegation that the deceased left a widow and next of kin. This was the gist of the action. * * * Whether she or Ann Barber was the widow was wholly immaterial. The fact would be important when the administrator is called upon to make distribution. The validity of the marriage will have to be passed upon by the probate court," etc. In T. W. & W. R. W. Co. v. Brook, 81 Ill. 248, this case was cited and approved, and a similar doctrine held. In R. R. L. & St. L. R. R. Co. v. Delaney, 82 Ill. 199, the case of Conant v. Griffin, *supra*, was again cited and approved, and a similar doctrine held. We can not find that the Supreme Court has ever said or intimated that the doctrine in Conant v. Griffin has been doubted or overruled. The case cited by appellant, of the Quincy Coal Co. v. Hood, Adm'r, etc., 77 Ill. 68, was a suit where the declaration averred that John Allen Hood, a minor, left surviving him his father, the plaintiff, to whom the damage recovered can be distributed. He asked the court to instruct, and it did instruct, the jury, that if they found the defendant guilty then they should assess the plaintiff's damages at the amount of the pecuniary loss

sustained, if any, by the next of kin to the deceased; "that is to say, his father, brothers, mother and sisters." The court held this to be erroneous. The court reversed the judgment for the reason that the instruction enlarged the scope of the plaintiff's damages on the trial and instructed the jury to take into consideration other next of kin whose right to damages must be based on another and different ground from that of the father—and it was calculated to take defendant by surprise. The evidence showed, against objection, there was a mother and five brothers and sisters. The court held that the naming of the father specifically compelled the plaintiff to prove it as laid, but if he had named the widow or next of kin generally then the rule would have been different. In this it seems to oppose the decision in Conant v. Griffin, as in that the name of the widow was treated as surplusage; yet that case is not overruled by reference. As the Conant-Griffin case has never been overruled, but referred to and approved since in the Hood case, *supra*, we adhere to the rule announced in the former case. The most serious objection that we see to the Conant case or the doctrine of the Hood case (77 Ill.), and the same principle found in other cases, is that the court seems to decide that the measure of the recovery is limited to the circumstances of the particular individual—his or her interest in the life of the deceased—not the full value of the life, as a whole. In the Conant case the opinion necessarily presupposes that the life was worth just the same to one widow and set of children as another; that is, the entire value of a life as a whole. In such case it would be indifferent to defendant whether one or another was entitled to it, as the measure of recovery would be the same no matter who got the proceeds. In the Hood case, above, the next of kin were collateral, and not the direct heirs. They were the father, mother, brothers and sisters of the deceased, and not entitled as a matter of law to anything for support by virtue of their relationship. Hence the proof might show them to be entitled to something or nothing, according to circumstances. But in the case before us the law imposed on the father the duty of support to his wife and minor children. It may be,

and from expressions in the Hood case we are induced to believe, that the court regards that as a material difference. The facts in this case are in effect the same as the facts in the Conant-Griffin case, and from the fact that that decision is of long standing and has often been approved, we can not doubt that the doctrine will be adhered to as there announced. Again, the point of the decision in the Hood case was one of pleading simply, and the question here not involved. There being no error in the record the judgment is affirmed.

Affirmed.