[No. 8123. Department Two. November 4, 1909.]

## ARTHUR McKENZIE, *Respondent,* v. NORTH COAST COLLIERY COMPANY, *Appellant.*[1]

APPEAL—REVIEW—VERDICTS. The verdict of a jury upon conflicting evidence is conclusive on appeal.

MASTER AND SERVANT—ASSUMPTION OF RISKS—SAFE PLACE. Coal miners, who are paid extra for work in putting in props to protect the safety of the place, do not assume the risk of insufficient props where the work was done under the direction and control of a pit boss whose duty it was to supervise and inspect the work.

SAME—COAL MINES. The duty of a master to supply a safe place in which to work applies to a coal mine where the miners put in props to secure safety under the direction and control of a pit boss who supervised and inspected the work.

SAME—CONTRIBUTORY NEGLIGENCE—ASSUMPTION OF RISKS—SAFE PLACE. A coal miner is not guilty of contributory negligence and does not assume the risk of the unsafety of the place in which he works, where injury resulted from a condition at another place, and could have been discovered only by an examination which it was not his duty to make.

SAME—SAFE PLACE—DUTY OF INSPECTION—PLEADING AND PROOF. Under a complaint by a coal miner for negligence in not supplying a safe place to work, the walls of the mine having fallen in, evidence as to the master's duty to make an inspection is admissible, since the duty to furnish a safe place necessarily requires inspection.

[1]Reported in 104 Pac. 801.

SAME—FELLOW SERVANTS—PIT BOSS AND MINERS. A pit boss in a coal mine is not a fellow servant, but is a vice principal, of miners with reference to the putting in of props under his direction and control.

SAME—SAFE PLACE—PREPARATION BY OTHER SERVANTS. While the master is not an insurer, a coal miner working in one battery, and injured by the fall of walls in another battery where the propping was negligently done by other miners, may recover on the theory that the master guarantees the safety of the place to work prepared by him.

APPEAL—REVIEW—INSTRUCTIONS REQUESTED BY APPELLANT. An appellant cannot complain of contradictory instructions which should not have been given, where they were given at his request.

TRIAL—INSTRUCTIONS—ORDINARY CARE—PROVINCE OF COURT AND JURY. It is not error for the court to refuse to determine for the jury the exact standard of ordinary care, but it is sufficient to state the general principles of law governing the case.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for $30,000 for injuries sustained by a coal miner twenty-four years of age, is excessive and should be reduced to $22,000, where it appears that both legs were paralyzed and he had lost control of his bowels and urinary organs, but that he was able to go about on crutches, and there was some hope for improvement, and the complaint limited his earning capacity to $150 per month.

Appeal from a judgment of the superior court for King county, Tallman, J., entered February 27, 1909, upon the verdict of a jury rendered in favor of the plaintiff for $30,000, for personal injuries sustained by an employee in a coal mine. Reversed unless $8,000 is remitted.

*Kerr & McCord*, for appellant.

*Brady & Rummens* and *Geo. H. Bailey*, for respondent.

DUNBAR, J.—This is an action for personal injuries, received by respondent while employed as a miner in the appellant's coal mine. The pertinent allegations of the complaint were as follows: That in order to render the chutes of said mine a safe place in which to work, it was necessary that the walls of said chutes, after the pillars of coal had been excavated, be pressed and held apart by means of timbers and

appliances; that on the 21st day of October, 1907, while the plaintiff was in the employ of the defendant and engaged in digging coal from the pillars at chute 14 between cross-cuts 2 and 3 in said mine, by reason of the negligence of the defendant in failing to provide the plaintiff with a safe place in which to work, by reason of its negligence in failing to keep the walls in and about chutes 12, 13 and 14 and between them and above the place where plaintiff was working, when the pillars had been drawn, securely timbered, braced, and held apart and in place, the coal, stone, and earth of said walls, above the place where plaintiff was working, without fault on the part of the plaintiff and without warning to him, gave way and fell down upon the plaintiff and crushed him, and caused the injuries thereafter alleged. The answer put in issue the charge that the defendant had failed to furnish plaintiff a safe place in which to work, and set up affirmatively assumption of risk, contributory negligence, and the negligence of fellow servants. The cause was tried to a jury, the defendant's motion for an instructed verdict was denied, and the trial resulted in a verdict in behalf of plaintiff for $30,000. A motion for a new trial having been by the court overruled and judgment entered, the defendant appeals to this court.

In order to make the complaint intelligible, it is necessary to give a brief description of the mine. The vein of coal lay at an angle of eighty-five degrees to the gangway. The vein being worked was nine feet thick. A slope had been driven down on the vein at a workable angle, and the coal was blocked off into squares in the usual way. The gangway was tunneled in from the side of the mountain, and from said gangway, at distances thirty-five feet apart, chutes five by six feet were driven up through the middle, a distance of about two hundred feet. These chutes were intersected every twenty-five or thirty feet by cross-cuts, four feet square. The cross-cuts were for the double purpose of admitting air

to the operatives and the removal of timber used in the prop-
ping of the mine.   In removing the coal, two miners worked
in each chute, beginning at the top of the upper cross-cut
and working toward the main gangway below.   Each miner
removed the coal to the center of the block on his side of the
chute.   The props were set about three feet apart through-
out the mine, and immediately above each cross-cut the
miners built a battery to protect themselves against the fall
of coal, rock, and debris which was constantly falling by
reason of the squeezing and settling of the walls.   Upon the
removal of the soft coal at the center of the vein, the walls
began to squeeze together and loosen the coal.   It is con-
ceded that no limitation was placed upon the use of timbers
by the miners, and that the timber was furnished for that
purpose.

While the record in this case is very voluminous and the
disagreement of counsel as to what the record shows has ne-
cessitated a careful examination of the whole, and while the
case is important not only by reason of its practical results
on the coal mining business, but by reason of the size of the
verdict, most of the practical questions involved have been
settled by the verdict of the jury.   For instance, on the
question which seems to have been deemed vital by the learned
counsel for appellant, viz., whether the falling mass which
injured the respondent came directly from above battery B
located just above cross-cut 4 in chute 14, or whether it
started from chute 13 and on its descent bore westward and
entered chute 14 above where respondent was working, there
is a sharp conflict of testimony, and without stopping to
review it, it is plain that there was competent testimony from
unimpeached witnesses tending to establish each conflicting
theory.   This was admitted by counsel for appellant in his
motion for an instructed verdict, when he stated that, under
the proofs before the jury, the caving or falling of the coal,
rock, and debris, through the falling of which respondent
was injured, came either, under the proofs of the respondent,

from a point above battery B, or it came, as shown from the testimony of the appellant, from chute 13 in the mine. So that, whatever the responsibility may have been in either event, the case comes here on the legally established fact that the injury was done to respondent from coal and rock falling from a point above battery B, and therefore necessarily by reason of the breaking of battery B.

The same thing may be said of the condition of battery B, both before and after the accident. And so as to the notice that was given to Nesbit, the pit boss, of the dangerous condition of said battery B just prior to the time when the respondent commenced work in chute 14, and, also, during the time that he was working there. If the jury believed the testimony of Arthur Provence and Dan McKenzie, discarding altogether the deposition of Campbell McPherson, which seems to be a little contradictory, it would have been fully justified in concluding that the mass in question fell from battery B; that battery B was in a dangerous condition when respondent went to work in chute 14; that Nesbit, the pit boss, knew of this condition; that respondent did not know of it, but worked under the explicit charge and directions of Nesbit. And it has by its verdict said that it did believe their testimony in these particulars. So that they must be accepted here as the facts of the case.

It also appears from the testimony of the appellant, through its representative Nesbit, the pit boss, that it was his duty to inspect the mine where these men were working, and that the duty was his alone, as shown by the following excerpt from his testimony on cross-examination:

"Q. You go in there, don't you, Harry, for the purpose of seeing how the timbers and things are looking and how the batteries are and whether the place is safe, and whether the miners propped it up all right? A. Yes, to see that the men are working. Q. Yes, to see that they are doing it all right? A. Yes, sir. Q. It is not only to protect yourselves but to protect the working place of the mine? A. Yes, sir. Q. You were the only man that was doing that? A. Yes, sir."

It also appears from the testimony of respondent's witnesses that, while the miners did the timbering and set the props, such work was done under the direction and control of the boss, who passed upon its efficiency and sufficiency. That it was not a part of the men's work for which they received compensation is shown by the fact that what work they did of that kind the boss paid them extra for. In the light of these facts, there is no assumption of risk on the part of the respondent, and the court did not commit error in refusing appellant's motion for an instructed verdict.

The appellant insists that the doctrine of a safe place is not applicable to a coal mine, and relies upon *Smith v. Hecla Min. Co.*, 38 Wash. 454, 80 Pac. 779, to sustain that contention. But we think the trial court properly interpreted that case, and it does not appear from an examination of the opinion that it was the intention of the court to announce the bald rule that the doctrine of a safe place did not apply under any circumstances to a coal mine; but simply announced that, under some circumstances, it was the duty of the servant to investigate. The portion of the instruction which the court was criticizing in that case was as follows:

"It is sufficient to say, however, that the law does not under any circumstances exact from the servant the use of diligence in ascertaining such defects, but charges him with knowledge of such only as are open to his observation; beyond this he has a right to assume without inquiry or investigation that his employer has discharged his duty of furnishing him with a reasonably safe place in which to perform his duties,"

regarding which this court said:

"The meaning of much of this instruction is obscure. The last part thereof is clearly erroneous. The law *does* require the servant to use some diligence in ascertaining defects, and in protecting himself from the dangers to be reasonably apprehended therefrom—such diligence and care as a man of ordinary prudence would exercise under the same circumstances. He must, to protect himself from injury, use diligence commensurate with the dangers known by him to

be incident to the character and place of work wherein he is employed."

It would be doing injustice to the reputation of the court to conclude that it intended to make the announcement that under no circumstances would the doctrine of safe place apply to the operation of a coal mine. There can be nothing sacred about a coal mine, as such, which relieves it from liability under circumstances which would create a liability on the part of other employers. The court in the *Smith* case, *supra*, in the course of its argument, pointed out the fact that coal mining was known to be fraught with danger. But many other employments are also fraught with danger. In fact, it may be said that every employment is fraught with *some* danger. So that, after all, it is simply a question of degree, and the amount of care which the servant must exercise is equally a question of degree. The principle is the same in one employment as another, and the circumstances surrounding each particular case must be considered before it can be determined whether the servant can absolutely rely on the doctrine of safe place, whether he cannot rely upon it at all, but in staying in the employment assumes the risk, or whether the reliance upon the master and his own caution are to some extent mutual. There is such a dissimilarity in the way in which coal itself is mined that the same rule in regard to the assumption of risk cannot be applied. In mining a flat vein of coal, where the miner stands facing the breast of coal in which he is digging, one kind of danger is to be apprehended. But where he is digging in a vein which is nearly perpendicular, and is on the top of the coal, another character of danger may beset him. In this case, as we have seen, he was digging from the top of the chute down. The employment might appropriately be likened to the digging of a well, with the exception that that which he dug was taken out below instead of being hoisted above for exit. So that it might as well be said, in a case where the servant is injured through the alleged negligence of the master in not

maintaining safe appliances for hoisting, or in not making provision to prevent the caving of the earth in the body of the well, that the doctrine of safe place did not apply to well digging.

The first case cited by appellant, viz., *Roccia v. Black Diamond Coal Min. Co.*, 121 Fed. 451, we think does not sustain its contention. In that case the court laid down the rule, which is unquestionably correct, that if the workman exposes himself to dangers' that are so threatening or obvious as likely to cause injury at any moment, he is, notwithstanding any promise of his employer, guilty of contributory negligence if he remain at the work. In other words, as the court said: "He assumes the risk of the danger which he knows and appreciates." This decision followed the case of *District of Columbia v. McElligott*, 117 U. S. 621, 6 Sup. Ct. 884, 29 L. Ed. 946, where the same principle was announced. But what were the circumstances to which this rule was applied? The court said:

"Plaintiff in error was an experienced miner, and had been for years at work in the mine. It was his special duty to timber the mine and to look out for and remedy the very dangers which caused his injury. No one in the mine knew so well as he the perils to which in this particular occupation he was exposed. This is not a case where an employee, unaware of the perilous nature of his employment, remains at work under a request for or promise of assistance of the master, nor is it the case of one who was under disability or was incapable of estimating the danger. The dangers were such as in his regular employment it was his duty to deal with. They were confessedly visible and obvious to him. They were the natural result of the progress of the work of mining."

But in the case at bar, instead of being the special duty of respondent to look after the batteries and other supports, it was the special duty of the pit boss, not only according to the testimony of respondent's witnesses, but according to the admissions of the pit boss. Consequently the same rule could not apply. The next case cited, *Cully v. Northern*

*Pac. R. Co.*, 35 Wash. 241, 77 Pac. 202, is equally inappropriate.

We cannot review all of appellant's cases within the appropriate limits of an ordinary opinion, but from an examination we think as a rule they fall as far short of sustaining appellant's contention as the case just above mentioned, in addition to the fact that many of them lay down rules on contributory negligence, master and servant, and the effects of promise to mend on the part of the master, which are opposed to the uniform holdings of this court. It must be borne in mind that there was no apparent danger here that was brought to the attention of the respondent. We are speaking now, of course, from the standpoint of the respondent's testimony. The condition of battery B was not discoverable from the place where the respondent was working, and the distinction must be borne in mind between an injury which occurs from a defect or a wrongful operation in the machinery or thing with which the servant is working, and an injury which is produced by contact with something which is disconnected from the work. Its condition could only be discovered by an examination, and it was not the respondent's duty to make such examination. Its dangerous condition had been disclosed to the pit boss by prior workmen, so that there seems to be no question of imminent or apparent danger in the case.

The appellant insists that testimony should not have been admitted tending to show the condition of the batteries, or the liability of the appellant for anything except the alleged negligence in allowing the walls to fall; and that there was nothing in the complaint upon which the testimony in regard to inspection could be based. But the duty of maintaining a safe place must necessarily carry with it the duty of making such inspection as is necessary to maintain the safe place. From the undisputed testimony, including the testimony of the pit boss, this case is brought within the

announcement made by the court in *Green v. Western American Co.*, 30 Wash. 87, 103, 70 Pac. 310, viz:

"The general duty is also imposed upon the operator to see that the working places in the mine where props are necessary to keep the mine from caving in are propped, and that the working places are frequently inspected to ascertain whether the props are put up; and to see that the workmen put up the props as their work progresses. A failure to do this is negligence."

It is true that was an action brought under the statute, but the announcement was of the general law. It is too well settled for discussion that the pit boss was not a fellow servant of respondent, but was a vice principal of the appellant.

So far as establishing the negligence of the master is concerned, it may be admitted that he is not an insurer, and therefore does not warrant the safety of his employees or his plant; but he must use reasonable precaution, and his duty to guard against defects or want of repair is a continuing one. Under the testimony in this case, we think the jury was warranted in finding that the appellant was guilty of negligence. Conceding that battery B had been constructed by the servants, it is admitted that it had not been constructed by the respondent, which brings the case within the rule announced in *Cheatham v. Hogan*, 50 Wash. 465, 97 Pac. 499, where it was said:

"When one servant of a master constructs a scaffold for a particular purpose of the master, uses it for that purpose and then leaves it standing, and the master afterwards directs another servant, who had no part in its construction, to use it for another purpose, the master adopts the scaffold as his own, and thereby guarantees that it is a safe place on which to work."

While in this instance the battery was used for the same purpose, the principle of responsibility is not thereby changed.

The appellant urges error in the giving and refusing to

give certain instructions. The instructions given and prof-
fered are very lengthy, and we do not feel justified in setting
them forth here. But from an examination of them, we are
not prepared to say that reversible error was committed.
The instructions of the court stated the law correctly and,
while it is true that some of the instructions are in a sense
contradictory, the contradictory instructions were asked for
by appellant, and plainly should not have been given under
the established facts of the case. But the appellant, having
asked for erroneous instructions, cannot complain because
they were contradictory.

Counsel for appellant earnestly insists that the court erred
in refusing to instruct the jury exactly how far the doctrine
of safe place applied to coal mining cases, but this was re-
quiring more of the court than the law requires of it. It is
not practical for a court to enter into particulars in in-
structing a jury. Its duty is to announce general principles
applicable to the issues, and the jury must apply them to
the particular facts proven in the case. For instance, the
court instructed the jury as follows:

"In determining that degree of care which the defendant
was required to use, you should determine it by the standard
of ordinary care; that is, by that degree of care which a
reasonably safe, careful, prudent, cautious, skillful and com-
petent coal mine operator would use to protect his employee
from the dangers of the character which injured the plain-
tiff."

This was a proper announcement of the law, and the test
given was the test of ordinary care. The court could not pro-
ceed to tell the jury that a reasonably careful, prudent, etc.,
coal mining operator should inspect the coal mine every day
or every two days, and tell it just what a sufficient inspection
was. These are determinations to be made by the jury
after applying the principles of law given by the court to
the facts proven. Considering the whole case, we are unable
to determine that any prejudicial error was committed by the
court in the trial of the cause.

The contention is also made that the verdict is excessive, the result of passion and prejudice. This is always a difficult proposition for the court to deal with, for so many elements enter into the attempted calculation which are not susceptible of calculation at all. When we go beyond an estimate of what would constitute a comfortable or reasonable provision for life for the injured or disabled person, and undertake to compensate for pain, embarrassment, or mental anguish of any kind, we enter the realms of conjecture and speculation; for what would embarrass a person of one temperament, or of one character of mental endowment, would not affect another who was either possessed of a different temperament or was philosophical enough to disregard it. That which would produce the keenest mental anguish in a sensitive nature would have but little effect on one of a coarser mould, and of less refined nature. In spite of these difficulties, however, the doctrine is well established that these are elements of damage which may be taken into consideration. So that all the court can do is to see that the jury approximates a sane and temperate estimation, taking into consideration the feelings of the ordinary person as we can best understand them.

The respondent was twenty-four years old at the time of the accident. That he is a helpless cripple for life is probably established. At the time of the trial he was able to go about on crutches, both of his legs being paralyzed. But the doctors testified that there had been some slight improvement since the first shock and, while they testified in substance that the chances of permanent improvement were very slight, there is still some hope, under their testimony, of considerable improvement. According to his own testimony, he labors under the embarrassment of having no control of his bowels or urinary organs. Whether this difficulty will be alleviated in any degree is problematical. Considering the testimony of the physicians and the tendency of nature to work cures, we

think there is room for the indulgence of hope in this particular. According to the concensus of calculations made by standard mortuary tables, his expectancy was, from the time of the accident, about thirty-eight and one-half years. The complaint limited the amount of his earnings to $150 per month. It is true he was earning about seven dollars a day when he was hurt, but this was under specially favorable circumstances so far as compensation was concerned. There is no reasonable probability that he could continue through life to find so remunerative an employment. Neither does the calculation take into consideration the probability that an ordinary man would not, for so long a time, be permitted by the ordinary vicissitudes of life, or even by his own inclination, to work every day in the month for so long a period. So that there must be a common sense application of these tabulated calculations. Taking into consideration the amount of money expended by the respondent in attempting to effect a cure, and the presumably permanent condition in which we now find him, we think that an available interest on $22,000, after deducting his legitimate expenses, would, under all the circumstances, be a reasonable compensation; and we therefore reduce the verdict to that amount. If the respondent remits the amount of $8,000 from the judgment within twenty days from the receipt of the remittitur in the trial court, the judgment will be affirmed; otherwise it will be reversed.

RUDKIN, C. J., PARKER, MOUNT, and CROW, JJ., concur.