[No. 9233.    Department Two.    February 1, 1911.]

## MATT HEMMINGSON, *Respondent*, v. CARBON HILL COAL COMPANY, *Appellant*.[1]

MASTER AND SERVANT—SAFE PLACE—TUNNELS — ASSUMPTION OF RISKS—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY. The questions of contributory negligence and assumption of risks by a miner injured through the fall of rock while assisting to timber a tunnel are for the jury, where the foreman inspected the place and ordered the plaintiff to work there, and there was some evidence that it was customary for miners engaged in timbering to sound the rock and make some inspection for themselves.

SAME—COAL MINING—STATUTES—APPLICATION. Rem. &. Bal. Code, § 7394, providing that the owner shall send down into the mine to be delivered at the working place sufficient timbers and props, in the act on the subject of "coal mines," relating particularly to the extra hazards of that business, has no application to prospecting tunnels in which no coal was being mined and which was not a part of a coal mine; the language indicating that the legislature had in mind the extra hazards peculiar to coal mining (DUNBAR, C. J., dissenting).

APPEAL—REVIEW—INSTRUCTIONS—TRIAL—HARMLESS ERROR. Upon a general verdict, the erroneous submission of the case upon the coal mining statute is not harmless, and a new trial is necessary, although there was sufficient evidence to go to the jury upon the common law liability.

MASTER AND SERVANT—SAFE PLACE—ASSUMPTION OF RISKS—INSPECTION—EVIDENCE OF CUSTOM. Where the character of tunnel work is constantly changing, in the absence of rules promulgated by the master or fixed by law, evidence is admissible of a custom of miners engaged in timbering to test and inspect the roof for themselves, regardless of a test made by the tunnel boss some time before the accident.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered May 2, 1910, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a miner through the fall of overhead rock. Reversed.

[1]Reported in 112 Pac. 1111.

*James M. Ashton* and *Huffer, Hayden & Hamilton,* for appellant.

*Bates, Peer & Peterson,* for respondent.

CHADWICK, J.—In January, 1910, the appellant was engaged in running a rock tunnel at its Carbon Hill coal mine. The tunnel was at that time about 1,600 feet long, and was in all respects the ordinary exploring or discovery tunnel, driven by miners with a hope or expectation of catching or cutting a deposit or ledge at depth. It ran through a formation of sandstone, and was timbered as the formation demanded. If the formation was faulty or soft or was passing through slips, it was timbered. If the formation was hard so as to sustain itself, no timbering was put in. The greater part of the tunnel had been timbered, a work in which the shift of which respondent was one was engaged at the time he was injured. The timbering consisted of setting in uprights, sixteen to eighteen inches in diameter, across the top of which a timber called a collar was placed. The uprights and collar were called a set. These sets were placed about five feet apart, and lagging was run from frame to frame on the rock side and top. It had been the general custom to set these frames and put in the lagging after each shot which would, with the drills and methods used at the mine, tear down about six feet of rock. A progress of about six feet in twenty-four hours was usually made, and eight or nine frames would be put up in seven days, if the formation was such as to require timbering. It was customary where the rock was soft and inclined to fall, to put splits or forepoles over the last collar, and wedge them up so as to support the roof while the permanent timbering was being put in.

At the time of the accident complained of, the tunnel had been carried a distance of about eleven feet beyond the last frame, the roof being, in the judgment of the tunnel boss, sufficient to sustain itself. A crew consisted of the machine man and helper and two muckers. When the crew of which

the respondent was the helper went to work, at seven o'clock on January 8, the tunnel boss made some inspection of the roof, the character and extent of which is a disputed fact; and he then ordered the men to clear out the muck or rubbish and set the frames in the space between the last set and the face of the tunnel. Respondent was engaged in making a hitch or depression in which to set one of the uprights, when a rock fell from the roof and cut his leg. He was taken to the local hospital, where his wound was temporarily dressed, and thereafter to a hospital at Tacoma where he was confined for about five weeks while his wound was healing.

The negligence alleged is that appellant put respondent to work in an unsafe place, failed to perform its duty of inspection, and failed to supply sufficient or proper timbers for temporary support of the roof, so as to make the place safe while permanent timbers were being put in. The defense is assumption of risk, contributory negligence, and failure on the part of respondent to follow a custom prevailing among miners engaged in making an unsafe place safe, to inspect by sounding and testing the rock for themselves and following their own judgment.

We think the facts are such as to warrant the submission of the case to the jury upon the general issues of assumption of risk and contributory negligence, and that the motions for nonsuit and directed verdict were properly overruled. *Starck v. Washington Union Coal Co.*, 61 Wash. 213, 112 Pac. 235. But we are nevertheless constrained to hold that the case was submitted to the jury upon a wrong theory of the law, and that a new trial must be granted.

The court assumed that chapter 3 of title LIX, Rem. & Bal. Code, in which it is provided (§ 7394) that the owner of a coal mine,

"shall keep a sufficient supply of timber at any such mine where the same is required for use as props, so that the workmen may at all times be able to properly secure the said workings from caving in, and it shall be the duty of the owner,

agent, or operator to send down into the mine all such props when required, the same to be delivered at the entrance of the working place,"

was applicable to this case. That section of the statute must be construed in the light of the whole act. The design of the act is clearly apparent; that is, to protect men who are engaged in the business of mining coal, the extraction of which, by reason of its formation and the angles at which it usually lies in the ground is extra hazardous. "Coal Mines" is the subject of the act, and the protection of workmen in coal mines is its object. It provides for inspection, underground maps, ventilation, measurement of air, openings, exits, signals, hoisting pumps, safety lamps, proper tools, and care of the men engaged, as well as timbering. It is a complete act, and in our judgment cannot be held to apply to a discovery or exploring tunnel in which no coal is being mined, as was the case here. The work here engaged upon was in no sense different from the work of those engaged in exploring for gold or silver or copper. The work of coal mining was not being done, and might never be done in or through that tunnel. The tunnel was not a coal mine, but it might become a part of one, depending upon future developments. Statutes must be construed according to the natural, obvious, and popular meaning of the language employed. Potter, Dwarris on Statutes, pp. 143, 144. And when so construed, it would extend the coal mine statute beyond the limit of legislative intention to hold that a rock tunnel was a coal mine and subject to its operation. In speaking to a like question, the appellate court of Illinois said, in *Springside Coal Min. Co. v. Grogan*, 53 Ill. App. 60:

"It is argued that the object and purpose of the statute was to guard against accidents and injuries of the exact kind and character as that which resulted in the death of the husband of the appellee, and that her case is clearly within the reason and spirit of the enactment. This is as fully true of all pits or holes made in the earth, and if allowed to control, would extend the operation of the statute to pits or holes

by which it was designed to reach and open lead or other mines of every kind. Pits or holes intended to be used as salt wells or to procure water for stock or other purposes, where employes would be exposed to like danger, as that which caused death in the case at bar, would be equally within the spirit and reason of the statute. The General Assembly, however, restricted the statute to coal mines. Courts may expound statutes, but have no power to enact them, nor to extend such as are enacted, to cases which it might seem in good reason ought to be, but are not, included within them. 'All authorities agree, it is said, in Sutherland on Statutory Construction, Sec. 235, that courts cannot correct the excesses, or supply omissions in legislation.' "

In considering the applicability of certain instructions such as were given by the court in this case and to which exceptions were taken, the court said, in the same case:

"Each of the instructions assumes that the pit or hole in which the deceased was working, was a coal mine, and each declares that the statute required the mouth of the pit to be fenced. Whether it was a coal mine was a question of fact. The declaration alleged, and the proof indisputably showed, that the deceased, when killed, was engaged in digging the earth in the bottom of a pit or hole, which was intended, when completed, to be used as the shaft of a coal mine, which the appellant company designed to open and operate. No mine was being operated or worked; no coal had been mined; none had been found to mine; nor was it ever shown that there were any indications of the existence of coal that the pit or hole would ever reach."

The ordinary definition of a mine is familiar, but a coal mine has not been so frequently defined. In *Westmoreland Coal Co.'s Appeal*, 85 Pa. St. 344, the court said:

"It may be conceded that the term mine, when applied to coal, is generally equivalent to a worked vein, for by working the vein, it becomes a mine."

Just when a tunnel or shaft may develop into a mine may be determined with reasonable certainty. In *Coal Run Coal Co. v. Jones*, 19 Ill. App. 365, it was contended that a certain

shaft was not a "coal mine," and that the statute did not apply. The facts and conclusion of the court are as follows:

" 'The Coal Run Company had just completed an extension of its shaft below a vein of coal that it had been working and mining and had reached and dug through a lower vein and had dug several feet below it for the purpose of collecting the drainage of the mine,' and in the opinion of the court says, 'workmen were actually engaged in mining coal from the first vein. . . . . The deceased himself was about to pick up and place in the cage a lump of coal sufficient to justify a finding that the place was a coal mine, within the meaning of the statute, and we think nothing beyond that is or was intended to be held.' "

Our conclusion that the statute does not apply in this case receives assurance from the fact that the section of the statute relied upon says that "it shall be the duty of the owner, agent, or operator to *send down into the mine* all such props when required, the same to be delivered at the *entrance of the working place*," indicating as clearly as language could indicate anything, that the legislature had in mind those conditions peculiarly incident to the mining of coal which usually lies in blanket formation; that it is brittle and without strength to sustain itself; that it forms in layers through which strata or rock slate or shale run, and which tend to make it more dangerous, and out of which gangways and chambers are cut; the mining of which has so frequently been described in previous cases decided by this court, particularly in: *Cox v. Wilkeson Coal & Coke Co.*, 61 Wash. 343, 112 Pac. 231, and *McKenzie v. North Coast Colliery Co.*, 55 Wash. 495, 104 Pac. 801.

While the master is bound to use that degree of care which the attending circumstances and the character of the work will allow, for the protection of workmen engaged in extending all tunnels (for the coal mine statute does not relieve him of his common law duty), we find no warrant in the law authorizing us to extend or apply the coal mine act to a prospecting

tunnel, when the legislature itself has purposely refrained from doing so. There may have been reasons why the presumption of negligence or the denial of the defense of assumption of risk was not put upon the less hazardous business of the ordinary miner or prospector engaged in driving a tunnel through solid rock, or the sewer contractor, or the director of underground work; for the one who is seeking to develop an industry is not to be discouraged, while the one who has established a business should be prepared to meet the burdens incident to its promotion. There being enough evidence to carry the case to the jury upon the common law liability of the appellant, but that evidence being conflicting, we cannot say that the jury found with respondent upon the main issues and against him upon the statute, or with him upon the statute and against him on the common counts. The submission of the case upon the coal mine act was, therefore, error calling for a new trial.

Much is made in the brief of appellant that it was denied the right to show that it was the custom of men engaged in tunnel work to test and examine the roof for themselves, and that under a condition subject to constant change, reliance could not be had on a test made by the tunnel boss at some considerable time before the accident occurred. It is true that the trial judge excluded certain testimony and offers to prove such custom, but a careful reading of the whole record shows that, nevertheless, the offered and excluded testimony was thereafter received in such form as would warrant the jury in considering it. In the event of another trial, it may not be out of place to say that, in the absence of specific rules promulgated by the company or prescribed by statute, evidence of such custom is competent, and would be applicable in this case, provided the jury should find the character of the roof to be such as to require constant inspection or testing.

Practically all of the questions raised in this case are brought here on exceptions to instructions given, and to the refusal of the court to give requested instructions. The in-

structions, taken as a whole, barring those based upon the coal mine act, state the law of the case. There is some confusion, but no greater confusion than is to be expected where both sides have apparently submitted a complete set of instructions from which the trial judge has made up a set to be given to the jury, without re-writing them so as to harmonize seeming contradictions.

Reversed and remanded for a new trial.

RUDKIN, CROW, and MORRIS, JJ., concur.

DUNBAR, C. J. (dissenting)—I dissent. I think the narrow construction placed upon the statute by the majority fixes a limit upon its application which was not contemplated by the legislature; and that the fear expressed that the provisions of the statute might be made to apply to gold, silver, or copper mining, is more fanciful than real. If it develops in the trial of a cause that the exploration was made in a gold, silver, or copper mine, of course the statute would not apply, and the court would so instruct. But in this case there was not a suggestion that the tunnel was not being run in the interest of the coal mine. The plaintiff in the case is the Carbon Hill Coal Company. The opinion starts out with the statement that, "in January, 1910, the appellant was engaged in running a rock tunnel at the Carbon Hill coal mine" (and it was at that date that this accident occurred). The testimony shows and the opinion states that the tunnel was being driven by miners, with the hope or expectation of cutting a ledge or deposit at depth, and there is no claim or suggestion in the testimony that the excavation was in the interest of anything else than a coal mine, or that the tunnel was being driven for any other purpose than collecting or locating a ledge of coal. The following excerpt from the testimony of the foreman of the mine is suggestive:

"Q. What is the difference between running a rock tunnel and running ahead into your coal and mining out the coal? A. Our gangways are driven on the same principle when we

mine in coal, and shoot the rock out in the bottom, if the coal is on a pitch, and shoot the coal out first, and have a hole up here for the rock, and shoot it out. Q. That is not the only rock tunnel you have up there in the Carbon Hill coal mine, is it? A. We have driven thousands of feet of it. Q. A rock tunnel is one of the incidents of · every coal mine, either to find the vein or whether it is run through to cross-cut different veins? A. They drive them for that purpose."

When it conclusively and confessedly appears that the rock tunnel was being operated in a coal mine for the purpose of discovering ledges of coal, I can see no reason why the statute which guards the safety of miners in a coal mine should not apply. The construction placed upon the statute by the majority opinion ignores the spirit and reason of the law, and it is the letter that killeth.             ·